Estate of Walter Lenoir Patton, Deceased, Ernest Patton, Executor v. Commissioner.
Estate of Walter Lenoir Patton v. Commissioner
Docket No. 20273.
United States Tax Court
1951 Tax Ct. Memo LEXIS 48; 10 T.C.M. (CCH) 1066; T.C.M. (RIA) 51328; October 31, 1951
Carl F. Bauersfeld, Esq., Robert Ash, Esq., and J. M. Wells, Esq., 501 Masonic Temple, Greenville, S.C., for the petitioner. Percy C. Young, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: Estate tax is the subject matter of this case. Deficiency was determined in the amount of $10,308.23. The only questions presented to us are: (a) Whether the Commissioner erred in determining the value of certain corporate stock to be $414.25 a share, instead of $300 a share as contended for by the petitioner; (b) whether the Commissioner erred in determining that a transfer in trust by the decedent on December 30, 1943, was made in contemplation of death within the intendment of section 811 (c), Internal Revenue Code *49 . Findings of Fact The facts stipulated by the parties are so found. The petitioner is the Estate of Walter Lenoir Patton, Deceased, acting through Ernest Patton, Executor. The estate tax return here involved was filed with the collector of internal revenue for the district of South Carolina. Decedent, Walter Lenoir Patton, was born in Hendersonville, North Carolina, on November 24, 1870. He died testate August 15, 1944, while a resident of Greenville, South Carolina. Ernest Patton, son of the decedent, is the duly appointed and acting executor of the estate of Walter Lenoir Patton, deceased. The decedent was survived by his wife, Lula G. Patton, and four children, namely, Ernest Patton, Lewis Patton, William David Patton and Lenoir Patton. During his lifetime, the decedent was for many years a successful merchant in Greenville, South Carolina. At the time of his death, he was president and treasurer of the firm of Patton, Tilman & Bruce, Inc., which operated a retail shoe store in Greenville, South Carolina. In addition, the decedent was a banker and at the time of his death was the president of the Peoples National Bank of Greenville, South Carolina. Until the very *50 day of his death, the decedent enjoyed good health. On the day preceding his death, he was actively engaged in performing his duties as president of the Peoples National Bank of Greenville, South Carolina. On the morning of his death he was preparing to go to the bank. During his lifetime and up until the day of his death, the decedent worked every business day at the bank of which he was president. He was never absent from his work because of illness other than for an occasional cold. He had never been relieved of any of his official duties at the bank. In addition, he supervised the business affairs of the retail shoe store of Patton, Tilman & Bruce, Inc., and spent practically every afternoon at the store. The retail store had an acting manager but no one was ever appointed actual manager until after the death of decedent. He looked after the store, supervised all the financial affairs of the business, signed checks in payment of the invoices, checked sales, controlled buying, handled personnel problems and actively assisted in controlling and taking inventories. The decedent died on the morning of August 15, 1944, from a coronary thrombosis. His death was sudden and unexpected. *51 The first indication of a heart condition was on the day of and only an hour prior to his death. The decedent had no previous heart attacks and no reason to anticipate his fatal illness. Decedent took good care of his health. For a number of years prior to his death, he had two or three periodic physical examinations by his physician a year. These examinations by his physician did not include examination of eyes or teeth. He had some false teeth, and wore glasses regularly for years before his death. The last examination by his physician was approximately three months prior to his death. At that examination he was found to be in good physical condition. The decedent was a methodical man of regular and careful habits. He was eventempered, cheerful and placid in disposition. The attack from which he died was sudden and without any preliminary illness. At the time of his death, the decedent was 73 years of age. However, he was in good physical condition and actively engaged in business as a banker and merchant. Until the day of his death, he was progressive and making business plans for the future. His outlook on life was optimistic and hopeful. Up until the time of his death, the *52 decedent was an active man. He devoted about an hour a day to his hobby of gardening during the gardening season. He usually walked to and from work, which was a distance of about a mile and a quarter each way. The decedent was a man of unusual prudence and foresight and handled his personal and business affairs with careful thought and consideration. In 1943 the decedent had more income than he needed. His children had completed expensive educations and his 1943 income exceeded his personal needs. In the fall of 1943, he determined to set up a trust to provide for his wife during her lifetime and, upon her death, for his four children. Over a period of six months prior to the execution of the trust indenture, the decedent consulted with his attorney and had a number of conferences with him. The trust agreement was executed on December 30, 1943. Petitioner executed a new will on January 3, 1944. It was drawn by the same attorney who drew the trust, and was "tied in" with the trust, in that the will, after providing for payment of just debts and funeral expenses, provided that the residue of the estate is willed, devised and bequeathed in trust, in accordance with the trust agreement *53 executed by the decedent on December 30, 1943, a copy of which trust agreement is recited in the will, to be "hereto attached and incorporated into and made a part of this will," with provision that the income and corpus of the residue of decedent's estate be held, managed, and ultimately distributed by the trustee upon the same terms as provided in the trust agreement of December 30, 1943. Ernest Patton was named executor. The will provided no other devises or bequests. Ernest Patton was named trustee under the trust indenture, and accepted the duties as trustee on December 30, 1943. The trust property consisted of real estate notes and mortgages, shares of corporate stock and cash in the form of a check of the decedent. The total value of the trust property as of the date of the trust was $30,000. Total gross estate reported in the estate tax return was $110,395.73. It was the intention of the decedent to give additional assets to the trust from time to time. The decedent specifically reserved the right in the trust agreement to make additional transfers to the trust as follows: "(6) I reserve the right to hereafter include in, convey or transfer to said trustee any additional *54 sums of money or property and in the event of future addition or additions to said trust, the same shall be held, managed, invested and distributed in accordance with the provision of this instrument; likewise, permission is hereby granted to said trustee to receive or accept any transfer, conveyance or assignment to said trust of such sums of money or such property as any or either of the beneficiaries of this trust might desire to make at any time hereafter." The provisions of the trust relating to the beneficiaries provided: "(5) It is my desire and intention that my wife Lula G. Patton shall be afforded a proper, comfortable and sufficient livelihood and said trustee in his discretion may pay any portion or all of the net income from said trust estate to my said wife at such time and in such manner as said trustee may deem advisable for the purpose of affording her such a livelihood and for that purpose and to that end he is further authorized to resort to the corpus of said trust in the event serious misfortune or other unforseen [unforeseen] circumstances, in his opinion, necessitate his so doing. However, should my trustee deem it unnecessary to pay any portion of said *55 income to my said wife for her support, then in such event said trustee shall permit and allow said income to accumulate and upon the death of my said wife said trustee shall pay the corpus or principal of said trust estate, together with any and all accumulated income, to my four children, namely, Ernest Patton, Lewis Patton, William David Patton, and Lenoir Patton, share and share alike; however, in the event any of my three sons above named or my daughter above named shall pre-decease my wife leaving a child or children or other lineal descendant, the portion of said estate which would have gone to such deceased son or daughter shall go to his or her child, children, or lineal descendant, but in the event any of my sons or my daughter should predecease my wife without leaving a child, children or other lineal descendant, then in such event the entire corpus and the accumulated income shall be divided among the survivors of my three sons and daughter as above named or their child, children or lineal descendant, share and share alike, with the understanding that said child, children or lineal descendant shall take only the portion of the estate which their parent would have taken *56 if living. Except, however, in the event any of my sons should predecease my wife without leaving a child or children then in such event the wife of such deceased son, provided she in the meanwhile has not remarried, shall take an amount equivalent to one-half of the portion such deceased son would have taken if living, and the remaining one-half of said son's portion shall be distributed in the same manner as hereinabove set forth." The purposes of setting up the trust were: To provide for decedent's wife during her lifetime and, upon her death, for his children; and to avoid Federal income taxes and Federal estate taxes. Decedent's son Ernest Patton was a banker of 30 years experience at the time of trial. Until 1948 he was with the South Carolina National Bank at Greenville, South Carolina, and since that time has been with Peoples National Bank of that city. At the time of trial, he was chairman of the board. The handling of property such as involved in the trust set up on December 30, 1943, was familiar to him and he would not have learned anything particularly valuable to him as a business man, in handling the trust property. He had handled many matters similar to those *57 involved in the trust, and there was nothing new to him in handling the trust assets so far as training him as a professional in the banking business was concerned. In addition to consulting with his attorney prior to executing the trust indenture, the decedent discussed the matter with his son, Ernest Patton, over a period of several months. He told the son his plans, including telling him, before execution of the trust, "that he would have to change his will so that if he died before mother that this trust would continue in order to support her." Decedent knew he was going to have to revise his previous will. At the time of the preparation of the trust, decedent gave no indication to his attorney, son, or physician of being apprehensive of his health or life. At the time of his death, the decedent owned 80 shares of common stock of the firm of Patton, Tilman & Bruce, Inc. This stock was valued in the estate tax return at $300 per share or $24,000. The firm of Patton, Tilman & Bruce, Inc., operates a retail shoe store in Greenville, South Carolina. Its earnings, Federal taxes and dividends for the years 1932 to 1946, inclusive, are as follows: Year
Earnings
Federal Tax
Dividends
1932
$ (2,731.97)
1933
4,143.68
$ 569.76
1934
4,136.99
568.84
$ 1,300.00
1935
7,445.45
1,023.75
1936
3,696.35
399.08
2,600.00
1937
4,046.52
385.12
3,750.00
1938
9,485.76
1,253.01
3,750.00
1939
8,623.59
1,132.30
5,000.00
1940
8,144.46
1,261.34
6,250.00
1941
25,487.92
8,202.51
5,000.00
1942
22,864.51
10,888.74
7,500.00
1943
68,605.05
48,837.65
7,500.00
1944
75,184.00
53,157.12
7,200.00
1945
75,764.19
51,454.59
7,200.00
1946
59,272.24
22,487.79
8,250.00
$374,168.74
$201,621.60
$65,300.00
*58 At the time of the decedent's death, there were 240 shares of common stock of Patton, Tilman & Bruce, Inc., outstanding. The stock was owned as follows: Estate of Walter Lenoir Patton
80 shares
R. G. Tilman
70 shares
J. M. Williams
30 shares
Julius H. Garrison
40 shares
Robert W. Bruce, Jr
10 shares
H. B. Smith
10 shares
The income and excess profits tax return of Patton, Tilman & Bruce, Inc., for the fiscal year ending January 1, 1945, recites a balance sheet as of December 31, 1944, indicating net worth on the latter date to be $99,421.87 or $414.25 per share of stock. The stock of Patton, Tilman & Bruce, Inc., was closely held and not traded in generally. The policy of the company was to limit stock ownership to officers and employees. The last sale of stock prior to the decedent's death was on March 7, 1944, when the firm of Patton, Tilman & Bruce, Inc., purchased 10 shares of its own stock from James E. Bruce for $3,000 or $300 per share. James E. Bruce had inherited the shares from his father and wished to sell them in order to buy a house. The first sale of stock following the decedent's death was on June 6, 1946, when five shares of treasury *59 stock were sold to George C. Ridenhour and five shares of treasury stock were also sold to Ernest Patton for $315 per share. Ridenhour was general manager of Patton, Tilman & Bruce, Inc. The company offered to sell him the five shares of stock at $315, payable $100 a month, that is the way it was purchased by him. The fair market value of the stock of Patton, Tilman & Bruce, Inc., on August 15, 1944, was $365 a share. The transfer of property by the decedent by the trust instrument on December 30, 1943, was made in contemplation of death. Opinion Two simple questions are here presented: What was the value of certain stock, at the time of decedent's death? Did he make the transfer in trust in contemplation of death? First, as to the stock: The respondent points out the presumption in his favor and, in substance, argues that it has not been overcome because the stock was closely held and the two sales depended upon by petitioner do not demonstrate fair market value; because his determination, as shown in the notice of deficiency, was based upon consideration of all relevant factors including corporate net worth and earning and dividend capacity, and petitioner has not proven *60 corporate net worth; because earnings averaged $53.27 a share for five years prior to January 31, 1945, and dividends, for the same period capitalized at 6 per cent, reflect value of $433.33 a share, all supporting his determination of a value of $414.25 a share, as opposed to the $300 argued for by petitioner. The petitioner, on the other hand, in effect argues that the stock was sold for $300 a share on March 7, 1944, (the last sale prior to decedent's death) when the corporation purchased ten shares, and that the next sale was at $315 a share when on June 6, 1946, ten shares of treasury stock were sold, the sales being to Ernest Patton, decedent's son, and to George C. Ridenhour. The Commissioner, the petitioner argues, apparently merely used book value, which, it is argued, is not synonymous with market value, and actual sales are the best evidence. Petitioner like the respondent points out that the stock was closely held. He argues that net worth is in fact shown by the introduction, as a joint exhibit, of the corporation income and excess profits tax return for the fiscal year ending January 31, 1945, and that the return shows that the Commissioner in determining value of the *61 stock as $414.25 a share used net worth. The return of course does not prove the facts therein set forth. It proves only what was claimed in the return. However, the return does indicate from the balance sheets attached a net worth per share of $414.25. It thus appears assuming that net worth was properly proven, it is the same value used by the respondent in determining value of the stock and tends to refute the petitioner's contention for a value of $300 a share. So far as the respondent appears to rely upon capitalization of earnings for five years prior to January 31, 1945, we consider that the petitioner's contention that the five years, including the war period, was an abnormal time and therefore does not represent fair market value, is sound to a considerable degree. Therefore, even though the crucial date is within the war-period, we think that the abnormality in values caused by the war tends to some extent to distort any value based upon five year period including the war. Under circumstances such as those here, where stock is closely held and there is no general market, many cases indicate that all circumstances should be examined in the search for fair market value. We *62 have examined the several elements of proof adduced, but consider it unnecessary to detail here such proof, except to note that we think it clear that the two sales of stock do not alone, under the circumstances here involved, demonstrate fair market value. On all of the evidence we conclude and hold that the stock at date of decedent's death had a fair market value of $365 a share. With reference to whether decedent in executing the trust of December 30, 1943, made a transfer in contemplation of death: Both parties have cited at length cases, including United States v. Wells, 283 U.S. 102, as demonstrating the proper criteria for consideration in this matter. We consider those principles so well settled at this date as to require no extended discussion here. The respondent points out the application of the presumption in his favor, inasmuch as the trust was set up within two years prior to decedent's death. Section 811 (c), Internal Revenue Code. Extensive evidence has been adduced on the point and we have not based our conclusion upon the presumption. We have studied and considered all of the factual circumstances involved. The petitioner died *63 suddenly of a coronary thrombosis and the whole record indicates that this was wholly unexpected. He had had no previous attacks and was for his age a vigorous business man. We have no doubt that the preparation of the trust a few months prior to his death was not actuated by fear on his part of immediate death. Such fact, however, is not under the cases including United States v. Wells, supra, by any means conclusive if he contemplated death even though not immediate in the transfer in trust. Close connection with a will is an indication of testamentary disposition and of contemplation of death. He discussed with his son both the trust and his will which he told his son he would have to change. The same attorney drew both the trust and the will, and the will was executed on January 3, 1944, the fourth day after execution of the trust. We take judicial notice that December 30, 1943, was Thursday, [Jones on Evidence, 2nd Ed., p. 815] and that Saturday, January 1, 1944, New Year's day, was a holiday in South Carolina [Sec. 7050, Civil Code S.C. 1932], therefore only one working day intervened between the dates of execution of the trust and the will. This tends to indicate *64 close connection between trust and will. The attomey who drew both stated that it was at his suggestion that he re-drew decedent's will but apparently he was not very sure of this fact for he had earlier stated in response to the question whether decedent had a prior will, as follows: "Yes, sir, he did and I believe - as I recall, it was my suggestion we change that will in order to make * * *." Since the decedent had earlier discussed with his son the necessity for changing his will, "so that if he died before mother that this trust would continue in order to support her," it can not be doubted that, regardless of the attorney's memory on the question, the decedent did have in mind before the execution of the trust the change in his will in connection with the execution of the trust. His attorney did not need to suggest to him the change of will. Moreover, it is the decedent's state of mind and not that of his attorney that is important. Though the attorney testified that there was no discussion on the last will until after the trust had been prepared and executed, the fact remains that there was discussion between decedent and his son on that subject, before execution of the trust. *65 The will and the trust served essentially the same purpose for the will merely, after providing for payment of debts and funeral expenses, placed all property in trust with Ernest Patton for the purposes of the trust of December 30, 1943, which is specifically referred to and "hereto attached and incorporated into and made a part of this will." There were no other devises or bequests. Thus, it is seen that the beneficiaries of will and trust were identical. We are convinced that the trust was testamentary in nature. Though petitioner contends that one object of the trust was to give decedent's son the opportunity of gaining experience in handling the trust's assets, the record shows that such matters are commonplace for the son, who was a banker of long experience and specifically testified that he had handled similar matters and that it was nothing new to him in handling the assets so far as his training as a professional in the banking business was concerned. We are unimpressed by the point. Though the decedent did have in mind to provide for his wife during her lifetime, this does not negative contemplation of death. Indeed, decedent's statement to his son, above recited, as to *66 changing the will "so that if he died before mother that this trust would continue in order to support her," is of itself indication of contemplation of death in the execution of the trust. The argument that the decedent wished to relieve himself of handling the property and especially of foreclosing upon a certain mortgage is likewise not impressive when we consider the nature of decedent's business experience. He did have in mind the saving of estate tax as well as income tax. Though the $30,000 in property placed in trust was not the major portion of his estate, it was a substantial portion thereof, some what more than one-fourth of the amount represented as gross income in the estate tax return, and the evidence is that he intended to add to the amount. After examination and study of all of the evidence we have come to the conclusion and we therefore hold that the transfer of property by trust by the decedent on December 30, 1943, was made in contemplation of death within the purview of section 811 (c) of the Internal Revenue Code. Decision will be entered under Rule 50.